UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

---

MARY ALFORD, on Behalf of All Others
Similarly Situated,

                             **Plaintiff,**

          -against-

WELLPOINT INC., ANGELA F. BRALY,
WAYNE DEVEYDT, LARRY C.
GLASSCOCK, LENOX D. BAKER, JR.,
SUSAN B. BAYH, SHEILA P. BURKE,
WILLIAM H.T. BUSH, JULIE A. HILL,
WARREN Y. JOBE, VICTOR S. LISS,
WILLIAM G. MAYS, RAMIRO G. PERU,
JANE G. PISANO, DONALD W. RIEGLE,
JR., WILLIAM J. RYAN, GEORGE A.
SCHAEFER, JR., JACKIE M. WARD, JOHN
E. ZUCCOTTI, RANDAL A. BROWN and
JOHN DOES 1-10 (BEING CURRENT AND
FORMER MEMBERS OF THE PENSION
COMMITTEE OF WELLPOINT INC. 401(k)
RETIREMENT SAVINGS PLAN),

                          **Defendants.**

Civil Action No.:

**1 : 08 -cv- 0617 -SEB -TAB**

**CLASS ACTION COMPLAINT
FOR VIOLATIONS OF ERISA**

---

       Plaintiff Mary Alford, individually and on behalf of all other persons similarly situated,

alleges the following based upon the investigation by Plaintiff's counsel, which included, *inter*

*alia*, a review of public documents filed by WellPoint Inc. ("WellPoint" or the "Company") with

the United States Securities and Exchange Commission ("SEC") and the United States

Department of Labor ("DOL"), conference calls and announcements made by Defendants,

securities analysts' reports, wire and press releases published by and regarding the Company,

and other publicly available information.

## INTRODUCTION

1.     This is a class action brought pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (a)(3), on behalf of the WellPoint 401(k) Retirement Savings Plan, known prior to December 31, 2005 as the Anthem 401(k) Long-Term Savings Investment Plan (the "Plan"), against the Plan's fiduciaries, including WellPoint.

2.     Plaintiff alleges that Defendants, as fiduciaries of the Plan, breached their duties to her and to the other participants and beneficiaries of the Plan in violation of ERISA, particularly with regard to the Plan's holdings of WellPoint common stock.

3.     During the Class Period (as defined below), Defendants knew or should have known that WellPoint stock was an imprudent investment alternative for the Plan. Defendants had intimate knowledge of, and an active role in, the improper activities that allowed WellPoint to artificially inflate and manipulate the Company's earnings.

4.     This action seeks relief on behalf of the Plan, for losses to the Plan, for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3)), Plaintiff seeks other relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

5.     Because Plaintiff's claims apply to the participants and beneficiaries of the Plan as a whole, and because ERISA authorizes participants such as Plaintiff to sue for breaches of fiduciary duty on behalf of the Plan, Plaintiff brings this as a class action on behalf of all participants and beneficiaries of the Plan during the Class Period.

## JURISDICTION AND VENUE

6.      **Subject Matter Jurisdiction.**  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

7.      **Personal Jurisdiction.**  ERISA provides for nation-wide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  As all Defendants are either residents of the United States or subject to service in the United States, this Court has personal jurisdiction over them.

8.      **Venue.**  Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, and/or some Defendants reside in or transact business in this District.

## PARTIES

### A.    Plaintiff

9.      Plaintiff was an employee of WellPoint during the Class Period and continues to be a Plan participant, within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1132(a).  During the Class Period, WellPoint stock was purchased or maintained on her behalf by means of the Plan in the WellPoint Stock Fund.

### B.    Defendants

#### *WellPoint Defendants*

10.     **Defendant WellPoint** is an Indiana corporation, with its principal executive offices located at 120 Monument Circle, Indianapolis, Indiana, 46204.  WellPoint is a commercial health benefits company, serving over 34.8 million medical members through provider networks. During the Class Period, WellPoint common stock traded on the New York Stock Exchange.

11.     WellPoint is the corporate parent of ATH Holding Co., LLC ("ATH Holding")[1], the Plan sponsor, within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B), and as such, exercises discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets. WellPoint, at all times, acted through its officers, directors and employees, including, but not limited to, members of the Board of Directors' Compensation Committee (the "Compensation Committee") and the Pension Committee (the "Pension Committee"), who were appointed by the Company to perform Plan-related fiduciary functions, and did so in the course and scope of their services for the Company.

12.     During the Class Period, WellPoint was the employer, sponsor and named and/or *de facto* fiduciary of the Plan. WellPoint had, upon information and belief, at all applicable times, effective control over the activities of its officers and employees, including their Plan-related activities. Through its Board of Directors (the "Board"), or otherwise, WellPoint had the authority and discretion to hire and terminate said officers and employees. WellPoint also had the authority and discretion to appoint, monitor and remove officers and employees that performed fiduciary functions with respect to the Plan, including the Director Defendants (defined below), the Pension Committee and the Compensation Committee.

13.     Additionally, by failing to properly discharge their fiduciary duties under ERISA, the officer, director, and employee fiduciaries breached duties they owed to Plan participants and their beneficiaries. Accordingly, the actions of the Company's officers, directors, and other employee fiduciaries are imputed to WellPoint under the doctrine of *respondeat superior*, and WellPoint is liable for these actions.

---

[1]     According to Exhibit 21 of WellPoint's Form 10-K, filed with the SEC on February 21, 2008 (the "February 21, 2008 Form 10-K"), ATH Holding is a subsidiary of WellPoint.

14.    **Defendant Angela F. Braly** ("Braly") has served as President and Chief Executive Officer ("CEO") of WellPoint since June 1, 2007.  Prior to that, Braly served as WellPoint's Executive Vice President, General Counsel and Chief Public Affairs Officer since April 2005.  Braly also serves as a director of WellPoint.  Braly signed WellPoint's relevant SEC filings during the Class Period, participated in the day-to-day management and overall direction of the Company, participated in the preparation of the statements alleged herein to be false, and communicated both directly and indirectly with Plan participants.  Braly was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition.  Braly was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and the management and disposition of the Plan's assets.

15.    **Defendant Wayne DeVeydt** ("DeVeydt") has served as Executive Vice President and Chief Financial Officer of WellPoint at all relevant times.  DeVeydt previously served as the Senior Vice President and Chief Accounting Officer of WellPoint, and was responsible for overseeing WellPoint's accounting and reporting functions, including all SEC filings, tax compliance, financial systems and certain shared services functions, including financial and accounting operations.  DeVeydt also assumed responsibility for investor relations and became chief of staff to the Office of the CEO in 2006.  DeVeydt signed WellPoint's relevant SEC filings during the Class Period, participated in the day-to-day management and overall direction of the Company, participated in the preparation of the statements alleged herein to be false, and communicated both directly and indirectly with Plan participants.  DeVeydt was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition.  DeVeydt was a fiduciary of the

Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and the management and disposition of the Plan's assets.

### *Director Defendants*

16.    **Defendant Larry C. Glasscock** ("Glasscock") has served as Chairman of the Board since November 30, 2005. Glasscock also served as President and CEO of WellPoint from 2001, until his retirement from day-to-day operations on June 1, 2007.

17.    **Defendant Lenox D. Baker, Jr.** ("Baker") has served as a director of WellPoint since 2002. Baker also served as a director of Anthem Insurance Companies, Inc. ("Anthem Insurance")[2], the Plan Administrator, from 2002 to May 2003.

18.    **Defendant Susan B. Bayh** ("Bayh") has served as a director of WellPoint since 2001. Bayh also served as a director of Anthem Insurance from 1998 to May 2003.

19.    **Defendant Sheila P. Burke** ("Burke") has served as a director of WellPoint since 2004. Burke also served on the former board of directors of WellPoint Health Networks, Inc. ("WHN Board") from April 1997 until WHN's merger with Anthem, Inc. in November 2004.

20.    **Defendant William H.T. Bush** ("Bush") has served as a director of WellPoint since 2004. Bush also served on the former WHN Board from January 2002 until November 2004.

21.    **Defendant Julie A. Hill** ("Hill") has served as a director of WellPoint since 2004. Hill also served on the former WHN Board from March 1994 until November 2004.

22.    **Defendant Warren Y. Jobe** ("Jobe") has served as a director of WellPoint since 2004. Jobe also served on the former WHN Board from March 2001 until November 2004.

---

[2]    According to Exhibit 21 of WellPoint's February 21, 2008 Form 10-K, Anthem Insurance is a subsidiary of WellPoint.

23.    **Defendant Victor S. Liss** ("Liss") has served as a director of WellPoint since 2001. Liss also served as a director of Anthem Insurance from 1997 to May 2003.

24.    **Defendant William G. Mays** ("Mays") has served as a director of WellPoint since 2001. Mays also served as a director of Anthem Insurance from 1993 to May 2003.

25.    **Defendant Ramiro G. Peru** ("Peru") has served as a director of WellPoint since 2004. Peru also served on the former WHN Board from May 2003 until November 2004.

26.    **Defendant Jane G. Pisano** ("Pisano") has served as a director of WellPoint since 2004. Pisano also served on the former WHN Board from June 2002 until November 2004.

27.    **Defendant Donald W. Riegle, Jr.** ("Riegle") has served as a director of WellPoint since 2001. Riegle also served as a director of Anthem Insurance from 1999 to May 2003.

28.    **Defendant William J. Ryan** ("Ryan") has served as a director of WellPoint since 2001. Ryan also served as a director of Anthem Insurance from 2000 to May 2003.

29.    **Defendant George A. Schaefer, Jr.** ("Schaefer") has served as a director of WellPoint since 2001. Schaefer also served as a director of Anthem Insurance from 1995 to May 2003.

30.    **Defendant Jackie M. Ward** ("Ward") has served as a director of WellPoint since 2002. Ward also served as a director of Anthem Insurance from 2002 to May 2003.

31.    **Defendant John E. Zuccotti** ("Zuccotti") has served as a director of WellPoint since 2005.

32.    Defendants Braly, Glasscock, Baker, Bayh, Burke, Bush, Hill, Jobe, Liss, Mays, Peru, Pisano, Riegle, Ryan, Schaefer, Ward and Zuccotti shall be referred to collectively herein as the Director Defendants.

33.    The Board, upon information and belief, has primary fiduciary oversight of the Plan. The Director Defendants are fiduciaries of the Plan within the meaning of ERISA in that they exercise discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets; and/or (iii) appointing, monitoring, and removing the Plan's fiduciaries.

34.    Because of the Director Defendants' positions, they were privy to the adverse non-public information about the business of WellPoint, as well as WellPoint's finances, markets and present and future business prospects, *via* access to internal corporate documents, conversations and connections with other corporate officers and employees, by attendance at Board meetings and committees thereof and *via* reports and other information provided to them in connection therewith.

35.    During the Class Period, the Director Defendants participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

### *Compensation Committee Defendants*

36.    **Defendant Ryan**, in addition to being a member of the Board, served as the Chairman of the Compensation Committee, at all relevant times. As such, Defendant Ryan was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

37.    **Defendants Burke, Pisano, Riegle and Ward**, in addition to being members of the Board, served as members of the Compensation Committee, and as such were fiduciaries of the Plan within the meaning of ERISA, in that they exercised discretionary authority with respect

to management and administration of the Plan and/or management and disposition of the Plan's assets.

38.    In addition to the Board collectively, the Compensation Committee, upon information and belief, is also a fiduciary of the Plan.  According to the Compensation Committee's charter, available on WellPoint's corporate website, the Compensation Committee is charged with, *inter alia*, "assist[ing] the Board in discharging its responsibilities relating to compensation and benefits provided by the Company to its executive officers and other employees." The Compensation Committee's charter further provides that among the duties and responsibilities of the Committee are:

> 1.    To establish the Company's general compensation philosophy and to oversee and approve the development, adoption and implementation of compensation plans and programs…

> *** 

> 4.    To review and approve compensation programs applicable to the executive officers and other employees of the Company…

> 5.    To establish incentive compensation plans and equity-based plans and to discharge any responsibilities imposed on the Committee by any of these plans'

> 6.    To oversee regulatory compliance with respect to compensation matters…

39.    The Compensation Committee and its members therein are fiduciaries of the Plan within the meaning of ERISA in that they exercise discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.  Further, each member of the Compensation Committee, by virtue of their committee position, was a member of the Board and therefore also had fiduciary responsibility to the Plan and its participants in that regard.

*Pension Committee Defendants*

40.    **Defendant Randall A. Brown** ("Brown") has served as the Chairman of the Pension Committee, at all relevant times.  Brown signed WellPoint's relevant SEC filings during the Class Period, including the Company's Form 11-K, dated June 13, 2007, and communicated both directly and indirectly with Plan participants.  Defendant Brown was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

41.    **Defendants John Does 1-10**, at all relevant times, served as members of the Pension Committee.

42.    Defendants Brown and John Does 1-10 shall be referred to collectively herein as the Pension Committee Defendants.

43.    At all relevant times, the Pension Committee Defendants were, upon information and belief, employees, officers, or directors of WellPoint.  The Pension Committee Defendants were fiduciaries of the Plan within the meaning of ERISA in that they exercised discretionary authority and discretionary control with respect to the Plan's management, administration, investments, and assets.

## THE PLAN

**A.    Nature of the Plan**

44.    The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) and defined contribution plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

45.    The Plan is a legal entity that can sue or be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is neither plaintiff nor defendant.  Rather, pursuant to ERISA § 409, 29 U.S.C. §1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan.  Stated differently, in this action Plaintiff seeks relief that is plan-wide.

46.    The Plan covers eligible employees of WellPoint and its subsidiaries.[3]

47.    According to the Company's Form 11-K for the fiscal year ended December 31, 2006 (the "2006 Form 11-K"), under the terms of the Plan, WellPoint will match up to 100% of the first 6% of eligible compensation contributed to the Plan, after one year of service.  Eligible employees become 100% vested in the Company's matching contributions after attaining the age of 55 or completing three years of service.  The 2006 Form 11-K further provides that "[a]ctive participants are immediately 100% vested in employee and employer contributions and any earnings thereon."

48.    Through December 31, 2005, State Street Bank and Trust Company ("State Street") served as the Plan trustee to administer the Plan's assets.  Effective January 1, 2006, Vanguard Fiduciary Trust Company ("Vanguard"), became the Plan trustee and all assets of the Plan were transferred from State Street to Vanguard on January 3, 2006.

49.    The WellPoint Stock Fund is the principal WellPoint common stock investment option under the Plan.  According to the 2006 Form 11-K, the Plan held $487,770,222 of WellPoint common stock at the end of the Plan year.

---

[3]    Effective December 31, 2006, the Empire Blue Cross and Blue Shield Employee Savings Plan (the "Empire Plan") was merged into the Plan. Total assets of $280,274,967 were transferred from the Empire Plan to the Plan. Participants of the Empire Plan became eligible to participate in and contribute to the Plan effective January 1, 2007.

**B.      Defendants' Fiduciary Status**

50.      *Named Fiduciaries*.  ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).  The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

51.      *De Facto Fiduciaries*.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent he or she "(i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

52.      Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and Plan participants under ERISA in the manner and to the extent set forth in the Plan documents, through their conduct, and under ERISA.

53.      As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plan, and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

54.     Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

55.     ERISA permits the fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries must still in fact act solely in the interest of participants and beneficiaries, not in the interest of the sponsor.  Moreover, all Plan's fiduciaries were obliged, when wearing their fiduciary hat(s) to act independently of WellPoint which had no authority to direct the conduct of any of them with respect to the Plan, the Plan's investments, or the disclosure of information between and among fiduciaries or from fiduciaries to Plan participants.

**C.     Defendants' Fiduciary Roles**

56.     As noted *supra*, WellPoint is the corporate parent of both ATH Holding, the Plan sponsor, and Anthem Insurance, the Plan administrator.

57.     Upon information and belief, the Plan documents describe WellPoint, the Board, the Compensation Committee and the Pension Committee as named fiduciaries of the Plan.

58.     Upon information and belief, instead of delegating all fiduciary responsibility for the Plan to external service providers, WellPoint chose to internalize at least some of these fiduciary functions.

59.     Upon information and belief, the Plan and its assets are administered and managed by the Compensation Committee and Pension Committee (collectively, the "Plan Committees"), selected and monitored by the Board.  The Plan Committees exercised broad

responsibility for management and administration of the Plan and, among their other duties, were responsible for oversight of the Plan's investment options, policies, and the performance of the Plan's investments, as well as the review of investment managers.

60.    In their capacity to select and monitor investment options for the Plan, the Plan Committees had the discretion and authority to suspend, eliminate, or reduce any Plan investment, including investments in WellPoint stock. Upon information and belief, the Plan Committees regularly exercised their authority to suspend, eliminate, reduce, or restructure the Plan's investments. The Plan Committees also reported to the Board regarding these duties and the Plan's events pertaining to the same.

61.    Upon information and belief, the Plan Committees exercised responsibility for communicating with participants regarding the Plan, and providing participants with information and materials required by ERISA. In this regard, on behalf of WellPoint and the Director Defendants, the Plan Committees disseminated Plan documents and materials.

62.    The Director Defendants are the Plan's fiduciaries to the extent they exercised their authority to select, monitor, retain, and remove the members of the Plan Committees and, accordingly, exercised authority and oversight over the Plan Committees, which reported to the Board regarding the Plan Committees' fiduciary duties and responsibilities to the Plan and with respect to their actions pertaining to the same.

63.    Therefore, the participation in and knowledge of WellPoint's inappropriate practices by Defendants as alleged herein is imputed and attributed to WellPoint, the Plan Committees, and the Director Defendants.

## CLASS ACTION ALLEGATIONS

64.     Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

65.     All persons who were participants in or beneficiaries of the Plan at any time during the Class Period, *i.e.*, between October 24, 2007 and the present, and whose accounts included investments in WellPoint stock.

66.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class who participated in or were beneficiaries of the Plan during the Class Period.[4]

67.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants each owed a fiduciary duty to Plaintiff and other Class members;

(b)     whether Defendants breached their fiduciary duties to Plaintiff and other Class members by failing to act prudently and solely in the interests of Plan participants and beneficiaries;

(c)     whether Defendants violated ERISA; and

---

[4]     According to the Company's 2006 Form 5500 filed with the U.S. Department of Labor and U.S. Department of Treasury, there were a total of 39,033 participants of the Plan at the end of the plan year.

(d)     whether the Class members have sustained damages and, if so, the proper measure of those damages.

68.     Plaintiff's claims are typical of the claims of the other Class members because Plaintiff and the other Class members each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

69.     Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

70.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

71.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

### I.  *Company Background*

72.    According to the Company's February 21, 2008 Form 10-K filed with the SEC, WellPoint is an independent licensee of the Blue Cross and Blue Shield Association and serves its members, as the Blue Cross licensee, in California and, as the Blue Cross and Blue Shield licensee, in Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia and Wisconsin.  The Company also serves its members throughout the country as UniCare. WellPoint is licensed to conduct insurance operations in all 50 states through its subsidiaries.

73.    WellPoint offers various network-based managed care plans to large and small employers, individuals, Medicaid and senior markets. The Company's managed care plans include preferred provider organizations; health maintenance organizations; point-of-service plans; traditional indemnity plans and other hybrid plans, including consumer-driven health plans; and hospital only and limited benefit products.  In addition, the Company provides a variety of managed care services to self-funded customers, including claims processing, underwriting, stop-loss insurance, actuarial services, provider network access, medical cost management and other administrative services. WellPoint also offers specialty products and services, including life and disability insurance benefits, pharmacy benefit management, specialty pharmacy, dental, vision, behavioral health benefit services, long-term care insurance and flexible spending accounts.

74.    WellPoint's policies consist of two primary categories: (a) self-funded and (b) fully-insured.  Under self-funded policies, WellPoint charges a service fee, while the employer or plan sponsor reimburses WellPoint for all or most of the healthcare costs.  Under fully-insured policies, WellPoint charges a premium and assumes all or a portion of the healthcare risk.  Self-funded policies are less profitable for WellPoint than fully-insured policies.

II. **Defendants Failed to Provide Complete and Accurate Information to Plan Participants Regarding WellPoint's Improper Business Activities, While Continuing to Invest the Plan's Assets in WellPoint Stock, When It Was No Longer A Prudent Investment for the Plan**

75.     During the Class Period, in order to maintain the Company's image as a steady earnings performer and as having strong financial growth, WellPoint persistently overstated its earnings estimates and failed to inform Plan participants that the Company's medical costs had increased significantly, while enrollment in the Company's fully-insured policies had plummeted. The eventual disclosure of WellPoint's true state of business affairs caused a precipitous decline in the price of the Company stock and the consequent detrimental impact on the value of Plan Participants' accounts.

76.     The Class Period starts on October 24, 2007.  On that date, WellPoint released its fiscal third-quarter 2007 results and provided the following membership and earnings guidance for 2008 in its Form 8-K furnished to the SEC:

> In 2008, we expect continued strong enrollment gains in National Accounts to be accompanied by new membership from our Medicaid contract awards in South Carolina and Indiana, and additional growth in our other commercial and senior businesses. ... While we will release our detailed 2008 financial guidance in December, we remain committed to our earnings per share growth target of at least 15 percent," added Braly.

77.     On December 11, 2007, WellPoint issued a press release, furnished along with its Form 8-K to the SEC (the "December 11, 2007 Form 8-K"), that confirmed the Company's "ability to meet the earnings expectations given in a press release and conference call on October 24, 2007" and announced WellPoint's earnings guidance for full fiscal 2008 of $6.41 per share. Defendant DeVeydt was cited in the December 11, 2007 Form 8-K as stating that:

> The financial model we have put in place continues to be validated by our strong earnings growth this year.  We are confident that this growth will continue in the coming year as we reinvest in our

business and continue our membership momentum, particularly in national accounts, senior, and local group markets. We also expect to continue our efficiency by further executing on our system migration strategy and by standardizing service operations to reduce costs while providing excellent service to our members.

78.    On January 7, 2008, WellPoint furnished its Form 8-K to the SEC, providing that:

Officers of WellPoint, Inc. expect to meet with securities analysts and investors during the period commencing on January 7, 2008 and ending on January 8, 2008.  During these meetings, the officers expect to confirm WellPoint's ability to meet the earnings per share expectations given in a press release and webcast on December 11, 2007 and in a press release and conference call on October 24, 2007.

79.    On January 23, 2008, WellPoint released its fiscal fourth-quarter and full year 2007 results in its Form 8-K furnished to the SEC (the "January 23, 2008 Form 8-K"). Commenting on the results, Defendant DeVeydt assured investors that "[w]e remain confident in our earnings per share target of $6.41 for 2008, which represents annual growth of 15.3% percent."

80.    The January 23, 2008 Form 8-K further provided that approximately 144,000 members from Connecticut's Medicaid managed care programs had been converted in fiscal fourth-quarter 2007 from fully-insured to self-funded contractual arrangements and that these 144,000 members were currently being serviced under a self-funded arrangement set to expire on February 29, 2008.

81.    On the same date, WellPoint held its fiscal fourth-quarter 2007 Earnings Conference Call (the "2007 Earnings Conference Call"), during which Defendants Braly and DeVeydt were the principal spokespersons for WellPoint.  Numerous analysts participated in the conference call, including analysts from Goldman, Sachs & Co. ("Goldman Sachs"), JP Morgan Chase & Co. ("JP Morgan"), Citigroup Inc. ("Citigroup"), Morgan Stanley, UBS AG ("UBS")

and Oppenheimer & Co.  During the conference call, Defendant Braly stated that WellPoint was "maintaining our $6.41 earnings per share" guidance for 2008 and that "reduced membership" experienced in 2007 had virtually no impact on WellPoint's earnings per share ("EPS"). Defendant DeVeydt, while acknowledging that WellPoint had experienced a rise in medical costs in fiscal fourth-quarter 2007, nevertheless reassured investors that:

- "[t]he higher than expected 4Q '07 benefit expense ratio resulted from items that generally should not impact 2008;"

- "our 2008 benefit expense ratio guidance remains at 81.6% for the year, given the strong full-year 2007 operating results;"

- "we continue to expect our 2008 medical cost trend to also be less than 8%;"

- "medical enrollment is now expected to approximate 35.6 million members with fully insured membership now expected to be 17.1 million and self-funded membership expected to be 18.5 million;" and

- "operating revenue is now expected to total approximately $62.6 billion."

82.    During the 2007 Earnings Conference Call, a Morgan Stanley analyst raised the issue of the relationship between WellPoint's medical costs, product pricing and profit margins, asking what the impact on 2008 profitability would be, where WellPoint lowered its pricing of products entering 2008 and following the higher medical costs in 2007 that WellPoint had experienced, which required the Company to increase its reserves for medical costs at year-end 2007.  Defendant DeVeydt responded that he was "not worried about '08, but your point is dead on for '07."  Defendant DeVeydt added that "I still feel very confident in our pricing and our renewals."

83.     When questioned by an analyst from UBS about the adequacy of the reserves for medical costs, Defendant DeVeydt responded that "we've met with the actuaries. . . and . . . we want to ensure that when we go into '08, that we go in with great confidence, that we're not going to fall short."

84.     Questioned by a Citigroup analyst concerning the time at which WellPoint recognized that fiscal fourth-quarter 2007 medical costs had increased beyond the levels that WellPoint had reserved for, Defendant DeVeydt responded that "by basically mid February [2007], we had pretty good visibility that we were starting to develop less favorably."

85.     Additionally, when asked by a Deutsche Bank analyst whether WellPoint had factored the slowing economy and its impact on medical cost trends into its 2008 guidance. Defendant DeVeydt informed the analysts that "we have backed into our guidance an assumption for a slowdown and specifically, we were very specific about it relative to the National Account business that we had expected.  Now the good news is I think our assumptions were conservative and we are actually seeing slightly better than expected results there, which is good."

86.     Defendant Braly concluded the 2007 Earnings Conference Call by stating that "we had a productive year in 2007 and we're off to a good start for 2008."

87.     Subsequently, in the Company's February 21, 2008 Form 10-K, Defendants boasted that "we believe geographic diversity reduces our exposure to local or regional regulatory, economic and competitive pressures and provides us with increased opportunities for growth." Defendants also assured investors that "[w]e continually monitor and adjust the claims liability and benefit expense based on subsequent paid claims activity," and that because WellPoint's medical claim liabilities are "short tailed," meaning that they are generally paid

within several months of the member receiving service from the provider, the Company can quickly assess and adjust the adequacy of its reserves for medical costs.

88.    Nowhere in the February 21, 2008 Form 10-K, did Defendants disclose that WellPoint had experienced a significant rise in medical costs, an unprofitable shift in new enrollment to self-funded members, and had priced its 2008 products at less profitable levels. Nor was it disclosed in the February 21 2008 Form 10-K, that as a result of these adverse material facts, the guidance that Defendants had provided for the fiscal first-quarter and full year 2008 was no longer reliable.

89.    Less than a month later, however, on March 10, 2008, WellPoint issued a press release headlined "WellPoint Revises 2008 Earnings Per Share Guidance," made part of its Form 8-K furnished to the SEC (the "March 10, 2008 Form 8-K"). Specifically, WellPoint stated that its first-quarter 2008 EPS were now expected to be in the range of $1.16 to$1.26, versus previous guidance of $1.44 per share. For the full year 2008, the Company now expected EPS to be in the range of $5.76 to $6.01, versus previous guidance of $6.41 per share. Defendant Braly attributed these revised earnings to "higher than expected medical costs, lower than expected fully ensured enrollment and, to a lesser extent, the changing economic environment in which we are operating."

90.    The March 10, 2008 Form 8-K further provided in pertinent part that:

> The revision in full year 2008 earnings guidance is primarily attributable to the following areas:
>
> • Higher Than Expected Medical Costs. The Company incurred higher-than-expected medical costs during the first two months of 2008 and has revised its full year outlook for Individual and Local Group fully insured medical cost trends to a range of 8.0 percent, plus or minus 50 basis points. Medical cost trends are also being impacted by less favorable than expected prior year reserve development in 2008.

• Lower Than Expected Fully Insured Enrollment. Medical enrollment exceeded 35.2 million members as of February 29, 2008, representing growth of 410,000 members from December 31, 2007. Although this overall membership increase was in-line with the Company's expectation, the composition of growth was weighted more towards self-funded products than the Company planned. Enrollment in fully insured products was below expectations primarily due to a shortfall in Medicare Advantage growth and declines in Small Group and Individual membership.

• Changing Economic Environment. The Company believes that current economic conditions have partially contributed to the lower fully insured enrollment results and higher than expected benefit buy-downs. In addition, a Medi-Cal premium reduction is scheduled for July 1, 2008, in California, the Company's largest State Sponsored market with approximately 1.2 million members.

91.    On this news, shares of WellPoint stock declined $18.66 per share from its close at $65.92 on March 10, 2008, to close at $47.26 per share on March 11, 2008.

92.    Following WellPoint's announcement of revised earnings, several prominent investment firms, including, Goldman Sachs, JP Morgan, Bear, Stearns & Co. Inc. and Stifel, Nicolaus & Co. Inc. downgraded their rating of WellPoint stock. *The Associated Press*, in a March 11, 2008 article entitled "Analysts Cut Ratings on WellPoint on Lower Outlook; Goldman Analyst Downgrades Managed Care," reported that:

Analysts cut their estimates on WellPoint Inc. Tues after the health insurer reduced its 2008 profit forecast, with at least two analysts downgrading the stock.

WellPoint shares fell 22 percent to $51.50 in premarket trading from a $65.92 close Monday.

On Monday, WellPoint said medical costs in 2008 will be higher than it previously expected, and enrollment of insured patients will be lower. It also expects weakness in the U.S. economy to hurt enrollment, reducing its profit in the first quarter and for the entire year.

Analysts from JP Morgan and Goldman Sachs cut their ratings to "Neutral" from "Buy." Goldman Sachs analyst Matthew Borsch also lowered his rating on the managed care sector, saying the reduced forecast suggests profits could start to shrink.

Medical costs are increasing and prices are under pressure, Borsh said. His rating on managed care providers went to "Neutral" from "Attractive."

He added that WellPoint miscalculated prices for 2008, and competitors have been more aggressive in cutting prices.

93.    On the same day, *MarketWatch.com*, an online financial publication, in an article entitled "Goldman cuts WellPoint, managed care sector," also reiterated the analysts' concerns with WellPoint's revision of its EPS estimates:

Goldman Sachs cut WellPoint's rating to neutral from buy and cut its view on managed care to neutral from attractive. "WellPoint's problems reflect company-specific underwriting error, but also reflect industry-wide pricing pressures that are now combined with upward pressure on underlying medical cost trends, substantially increasing the risk that the current cyclical slowdown in managed care becomes an outright downturn," the broker said.

94.    During the Class Period, as described herein, Defendants knew or should have known that WellPoint stock was artificially inflated, and thus an imprudent investment for the Plan, due to the following:

(a)    WellPoint was experiencing a significant increase in medical costs to the extent that Defendants had no basis in fact which supported their earnings guidance or their benefit expense ratio guidance;

(b)    WellPoint's reserves for medical costs were understated, in part, because the claims incurred in 2007 were significantly higher than the reserves established for those claims, which would negatively impact WellPoint's profitability;

(c)     WellPoint's enrollment growth was heavily weighted toward self-funded products which were substantially less profitable for WellPoint than the fully-insured policies;

(d)     WellPoint was not achieving significant new enrollment of fully-insured members in 2008, growth in Medical Advantage was greatly slowed and the enrollment in small group and individual membership policies was declining.  Defendants further knew or should have known that WellPoint had experienced a decline in fully-insured members throughout 2007 and that there was no basis in fact for this trend to change in 2008, particularly in light of existing economic factors; and

(e) WellPoint was being adversely impacted by economic factors which were not neutralized by WellPoint's geographic diversity and to an extent greater than the Company had factored into its 2008 guidance.

95.     Upon information and belief, WellPoint regularly communicated with employees, including Plan participants, about the Company's performance, future financial and business prospects and WellPoint stock.  During the Class Period, upon information and belief, the Company fostered a positive attitude toward WellPoint stock as a Plan investment, and/or allowed Plan participants to follow their natural bias toward remaining invested in the stock of their employer, even after divestiture was possible, by not disclosing negative material information concerning investment in WellPoint stock.  As such, Plan participants could not appreciate the true risks presented by investments in WellPoint stock and therefore could not make informed decisions regarding their investments in the Plan.

## CAUSES OF ACTION

### COUNT I

#### *Failure to Prudently and Loyally*
#### *Manage the Plan and the Plan's Assets*

### *(Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)*

96.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

97.    At all relevant times, as alleged above, Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

98.    As alleged above, Defendants were all responsible, in different ways and to differing extents, over management of the Plan or disposition of the assets of the Plan and were, during the Class Period, responsible for ensuring that the Plan's investment options, including WellPoint Stock Fund, made available to Plan participants, were prudent and are liable for losses incurred as a result of such investments being imprudent.

99.    Additionally, pursuant to ERISA, fiduciaries are required to disregard plan documents or directives they know or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, fiduciaries may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

100.    Defendants were obligated to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.    ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

101.    According to the DOL regulations and case law interpreting ERISA § 404, a fiduciary's investment or investment course of action is prudent if:  a) he or she has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and b) he or she has acted accordingly.

102.    Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:
  - The composition of the portfolio with regard to diversification;

○ The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

○ The projected return of the portfolio relative to the funding objectives of the plan.

103. Given the conduct of the Company as described above, Defendants could not possibly have acted prudently when they continued to invest the Plan's assets in WellPoint stock because, among other reasons:

- Defendants knew of and/or failed to investigate WellPoint's increased medical costs and the effect of the rising costs on WellPoint's operations;

- Defendants knew of and/or failed to investigate the decline in enrollment in WellPoint's fully-insured products as well as a shortfall in Medicare Advantage growth and declines in small-group and individual insurance membership;

- The risk associated with the investment in WellPoint stock during the Class Period was an extraordinary risk, far above and beyond the normal, acceptable risk associated with investment in company stock;

- This abnormal investment risk could not have been known by Plan participants, and Defendants were aware or should have been aware that it was unknown to them (as it was to the market generally), because the fiduciaries never disclosed it; and

- Knowing of this extraordinary risk, and knowing the participants were not aware of it, Defendants had a duty to avoid permitting the Plan or any participant from investing the Plan's assets in WellPoint stock.

104. Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, Defendants knew or should have known that WellPoint stock

was not a suitable and appropriate investment for the Plan as described herein. Nonetheless, during the Class Period, Defendants continued to invest the Plan's assets in WellPoint stock and to direct and approve the ongoing, automatic investment of the future Company contributions in WellPoint stock, instead of other, more suitable, investments. Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take adequate steps to prevent the Plan, and indirectly Plan participants and beneficiaries, from suffering losses as a result of the Plan's investment in WellPoint stock

105.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and other Plan participants and beneficiaries, lost a significant portion of their retirement investment.

106.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Defendants named in this count, are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT II

### *Failure to Provide Complete and Accurate Information to Participants and Beneficiaries*

### *(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by All Defendants)*

107.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

108.    As alleged above, during the Class Period, all Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

109.    As alleged above, the scope of the fiduciary responsibilities of all Defendants, to differing extents, included disseminating Plan documents and/or Plan-related information to participants regarding the Plan and/or assets of the Plan.

110.    The duty of loyalty under ERISA required Defendants to speak truthfully to participants, not to mislead them regarding the Plan or the Plan's assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan.

111.    This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding the prudence of maintaining investment in the Plan, so that participants can make informed decisions with regard to their investment options available under the Plan.

112.    This fiduciary duty to honestly communicate with participants is designed not merely to inform participants and beneficiaries of conduct, including potentially illegal conduct, bearing on their retirement savings, but also to forestall such misconduct in the first instance.  By failing to discharge their disclosure duties, Defendants facilitated the misconduct in the first instance.

113.    Defendants breached their fiduciary duties by failing to provide Plan participants with complete and accurate information regarding the increased medical costs as well as declining enrollment in Company's fully-insured products and, generally, by conveying inaccurate information regarding the soundness of the Company's financial health and the prudence of investing retirement contributions in the Company stock.

114.    Had the Defendants not constantly reinforced the safety, stability and prudence of investment in WellPoint stock during the Class Period, Plan participants, to the extent they were

- 30 -

permitted, could have divested their holdings of Company stock in the Plan or at least diversified such holdings, thereby mitigating the Plan's losses.

115.    Defendants in this Count are also liable as co-fiduciaries because they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding WellPoint stock, despite knowledge of their breaches. Further, they enabled such conduct as a result of their own failure to satisfy their fiduciary duties and as a result of having knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to Plan participants, yet not making any effort to remedy the breaches.

116.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment. Here, the above-described statements, acts and omissions of the Defendants in this Count constituted misrepresentations and omissions that were fundamentally deceptive concerning (a) WellPoint's increased medical costs; (b) decline in fully-insured products enrollment; and (c) the prudence of investing the Plan's assets in WellPoint stock, were material to any reasonable person's decision about whether or not to invest or maintain any part of their retirement assets in WellPoint Stock Fund during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of Defendants named in this Count.

117.    Plaintiff further contends that the Plan suffered a loss, and Plaintiff and the other Class members suffered losses, by the above-described conduct of Defendants named in this Count during the Class Period because that conduct fundamentally deceived Plaintiff and the

other Class members about the prudence of making and maintaining retirement investments in WellPoint stock, and that, in making and maintaining investments in WellPoint stock, Plaintiff and the other Class members relied to their detriment upon the materially deceptive and misleading statements, acts and omissions of Defendants named in this Count.

118.    As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.  If Defendants had discharged their fiduciary duties to prudently disclose material information, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the other Plan participants, lost a significant portion of their retirement savings.

119.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

### COUNT III

#### Failure to Monitor Fiduciaries

#### (Breaches of Fiduciary Duties in Violation of ERISA § 404 by WellPoint, Defendant DeVeydt and the Director Defendants)

120.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

121.    This Count alleges fiduciary breach against the following Defendants: WellPoint, DeVeydt and the Director Defendants (the "Monitoring Defendants").

122.    As alleged above, during the Class Period the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within

the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

123.    As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, and remove, and thus, monitor the performance of other Plan fiduciaries, including the Plan Committee Defendants.

124.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

125.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

126.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

127.    Here, the Monitoring Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made WellPoint stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries appreciated the huge and unjustified risk of significant investment loss by rank and file employees in their Plan accounts.

128.    In addition, the Monitoring Defendants, in connection with their monitoring and oversight duties, were required to disclose to those they monitored accurate information about the financial condition and practices of WellPoint that they indisputably knew or should have known, that the monitored Plan fiduciaries needed to make sufficiently informed fiduciary investment decisions.  By remaining silent and continuing to conceal such information from the other fiduciaries, the Monitoring Defendants breached their fiduciary duties under the Plan and ERISA.

129.    The Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in the fiduciary breaches by the monitored Defendants, they enabled the breaches by these Defendants and they had knowledge of these breaches, yet did not make any effort to remedy the breaches.

130.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the other Plan participants and beneficiaries, lost a significant portion of their retirement investment.

131.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT IV

### *Breach of Duty to Avoid Conflicts of Interest*

### *(Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)*

132.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

133.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

134.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and its beneficiaries.

135.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them when they occurred by (i) failing to engage independent fiduciaries and/or advisors who could make independent judgments concerning the Plan's investment in WellPoint stock and the information provided to participants and beneficiaries concerning it, (ii) failing to notify appropriate federal agencies, including the DOL, of the facts and transactions which made WellPoint stock an unsuitable investment for the Plan; (iii) failing to take such other steps as were necessary to ensure that Plan participants' interests were loyally and prudently served in order to prevent drawing attention to the Company's inappropriate business activities; and (iv) by otherwise placing the interests of the Company and themselves above the interests of the participants with respect to the Plan's investment in WellPoint stock.

136.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the other Plan participants and beneficiaries, lost a significant portion of their retirement investments.

137.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants named in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT V

### Co-Fiduciary Liability

### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by WellPoint, Defendant DeVeydt, Defendant Brown and the Director Defendants)

138.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

139.    This Count alleges co-fiduciary liability against the following Defendants: WellPoint, DeVeydt, Brown and the Director Defendants (the "Co-Fiduciary Defendants").

140.    As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

141.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he or she may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Co-Fiduciary Defendants breached all three provisions.

142.    **Knowledge of a Breach and Failure to Remedy**: ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, that fiduciary has knowledge of a breach by such other fiduciary, unless it makes reasonable efforts under the circumstances to remedy the breach. Here, WellPoint, DeVeydt, Brown and the

Director Defendants knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

143.    WellPoint, through its officers and employees, engaged in inappropriate business practices, withheld material information from the market, provided the market with misleading disclosures, and profited from such practices, and, thus, knowledge of such practices is imputed to WellPoint as a matter of law.

144.    Defendants DeVeydt and Brown, as well as the Director Defendants, by virtue of their positions at WellPoint, participated in and/or knew about the Company's inappropriate business practices, and their consequences, including the artificial inflation of the value of WellPoint stock.

145.    Because WellPoint, DeVeydt, Brown and the Director Defendants knew of the Company's improper business practices, they also knew that the Plan Committee Defendants were breaching their duties by continuing to invest the Plan's assets in WellPoint stock when it was no longer prudent to do so, and providing incomplete and inaccurate information to Plan participants. Yet, WellPoint, DeVeydt, Brown and the Director Defendants failed to undertake any effort to remedy these breaches. Instead, they compounded them by obfuscating the risk that the Company's improper business activities posed to WellPoint, and, thus, to the Plan.

146.    **Knowing Participation in a Breach:** ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. WellPoint knowingly participated in the fiduciary breaches of the Plan Committee Defendants in that it benefited from the sale or contribution of its stock at artificially inflated prices. WellPoint also, as

a *de facto* fiduciary, participated in all aspects of the fiduciary breaches of the other Defendants. Likewise, Defendants DeVeydt and Brown, as well the Director Defendants, knowingly participated in the breaches of the Plan Committee Defendants because, as alleged above, they had actual knowledge of the Company's improper conduct and yet, ignoring their oversight responsibilities, permitted the Plan Committee Defendants to breach their duties.

147.    **Enabling a Breach.** ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

148.    The failure of WellPoint, DeVeydt's, Brown and the Director Defendants to monitor the Plan Committee Defendants enabled those committees to breach their duties.

149.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the other Plan participants and beneficiaries, lost a significant portion of their retirement savings.

150.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## CAUSATION

151.    The Plan suffered millions of dollars in losses because a significant percentage of the Plan's assets was imprudently invested or allowed to be imprudently invested by Defendants in WellPoint stock during the Class Period, in breach of Defendants' fiduciary duties. This loss was reflected in the diminished individual account balances of Plan participants.

152.   Defendants are liable for the Plan's losses in this case because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.  Defendants withheld material, non-public facts from Plan participants, and provided inaccurate and incomplete information to them regarding the true health and ongoing profitability of WellPoint, and its soundness as an investment vehicle.  As a consequence, Plan participants did not exercise independent control over their investments in WellPoint stock, and Defendants remain liable under ERISA for losses caused by such investment.

153.   Had Defendants properly discharged their fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in WellPoint stock, eliminating WellPoint stock as the primary investment alternative when it became imprudent, and divesting the Plan of its holdings of WellPoint stock when maintaining such an investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered through its continued investment in WellPoint stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

154.   Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been so heavily invested in WellPoint equity during the Class Period.

155.   As a consequence of the Defendants' breaches, the Plan suffered significant losses.

156.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires

"any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan.. ...." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate. ...."

157.    With respect to calculation of the losses to the Plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available (as they were here, in the equities of other Companies), that the investments made or maintained in WellPoint stock would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the Plan's lost value and puts the participants in the position they would have been in if the Plan had been properly administered.

158.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (i) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2) and (3), 29 U.S.C. §§ 1109(a) and 1132(a)(2); (iii) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (iv) taxable costs and interests on these amounts, as provided by law; and (v) such other legal or equitable relief as may be just and proper.

159.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plan in this case.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.    An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had their accounts invested in the common stock of WellPoint maintained by the Plan in proportion to the accounts' losses attributable to the precipitous decline in the stock of WellPoint equity;

H.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.    An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.     An Order for Equitable restitution and other appropriate equitable and injunctive

relief against the Defendants, including appropriate modifications to the Plan to ensure against

further violations of ERISA.

DATED:     May 12, 2008                          COHEN & MALAD, LLP


                                                 Scott D. Gilchrist, #16720-53

                                                 Irwin B. Levin
                                                 Richard E. Shevitz
                                                 Scott D. Gilchrist
                                                 One Indiana Square, Suite 1400
                                                 Indianapolis, IN  46204
                                                 Telephone:  317/636-6481
                                                 Fax:  317/636-2593
                                                 ilevin@cohenandmalad.com
                                                 rshevitz@cohenandmalad.com
                                                 sgilchrist@cohenandmalad.com

                                                 Robert I. Harwood
                                                 Samuel K. Rosen
                                                 HARWOOD FEFFER LLP
                                                 488 Madison Avenue
                                                 New York, NY  10022
                                                 Telephone:  212/935-7400
                                                 Fax:  212/753-3630

                                                 Lori G. Feldman
                                                 Arvind B. Khurana
                                                 MILBERG LLP
                                                 One Pennsylvania Plaza
                                                 New York, NY  10119
                                                 Telephone:  212/594-5300
                                                 Fax:  212/868-1229

                                                 *Attorneys for Plaintiff*